IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                            CR No. 07-874 JP

CARLOS LOPEZ-MOLINA,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

On February 22, 2008, the Defendant filed a Motion to Suppress (Doc. No. 30). The Court held an evidentiary hearing on the Motion to Suppress on March 31, 2008. Assistant United States Attorney Louis Valencia represented the Plaintiff United States of America (USA) at the evidentiary hearing and Attorney Mark Fine represented the Defendant who was present at the hearing. Having considered the briefs (including supplemental briefs[1]), testimony from the evidentiary hearing, and the relevant law, the Court concludes that Defendant's Motion to Suppress should be denied.

A. FACTUAL BACKGROUND

On April 19, 2007, Defendant was driving a vehicle with a Colorado license plate through the State of New Mexico. At about 11:20 a.m., Defendant stopped for gas at the Route

---

[1]At the March 31, 2008 evidentiary hearing, the Court allowed Defendant to file a supplemental brief within ten days of having received the transcript of the hearing. Defendant received the transcript on April 14, 2008 but did not filed his supplemental brief until May 9, 2008, more than ten days after having received the transcript. The USA now asks the Court to strike the Defendant's supplemental brief for being untimely. In response, the Defendant filed a Motion for Leave to File Supplemental Memorandum in Support of Suppression Out of Time (Doc. No. 45), filed May 16, 2008. Although Defendant's supplemental brief is untimely, the interests of justice dictate that the Court grant Defendant's Motion for Leave to File Supplemental Memorandum in Support of Suppression Out of Time (Doc. No. 45) and decline to strike Defendant's supplemental brief.

66 Casino Truck Stop (Truck Stop).  The Truck Stop is located on Interstate 40, a known route

for the interstate transportation of drugs.  Defendant had a passenger in his vehicle, Elio Castillo-

Ramirez.

       Rio Rancho Police Officers Jeanette Tate and Lisa Gowen, members of the Middle Rio

Grande Valley Task Force (Task Force), were at the Truck Stop on April 19, 2007 to detect drug

violations and other criminal activity.  The Officers randomly observed travelers whose vehicles

had out-of-state license plates, and randomly checked out-of-state license plates to determine if a

vehicle had crossed the border from Mexico into the United States.  Officers Tate and Gowen

were not in uniform on April 19, 2007 and although armed, their firearms were not visible.

       Officer Gowen observed Defendant and his passenger pull up to a gas pump at the Truck

Stop.  Defendant and Castillo-Ramirez seemed to be in a hurry and they barely spoke to each

other as Defendant jogged to the Truck Stop convenience store and Castillo-Ramirez stepped out

of the vehicle to pump gas.  The Officers' vehicle was parked about 50 yards away from the

vehicle at the gas pump.

       Officer Tate approached Castillo-Ramirez while Officer Gowen remained about 20 feet

from Castillo-Ramirez observing the entrance to the convenience store.  Officer Tate asked

Castillo-Ramirez, in English, if she could speak with him and showed Castillo-Ramirez her

police badge.  Castillo-Ramirez did not appear to understand Officer Tate, so Officer Tate asked

Castillo-Ramirez, in Spanish, if he spoke English. Castillo-Ramirez stated that he did not speak

English.  Although not fluent in Spanish, Officer Tate can communicate in Spanish and

proceeded to speak to Castillo-Ramirez in Spanish.  Officer Tate reintroduced herself to Castillo-

Ramirez and again asked Castillo-Ramirez if she could speak with him.  Castillo-Ramirez agreed

to speak with Officer Tate.  Officer Tate then asked Castillo-Ramirez about his travel

destination.  Castillo-Ramirez stated that he and the Defendant were going to Albuquerque, New Mexico to visit Defendant's sick mother.  Castillo-Ramirez also indicated that the vehicle belonged to Defendant.

As Officer Tate was speaking with Castillo-Ramirez,  Defendant left the convenience store and started towards the vehicle at the gas pump.  Defendant then stopped suddenly, stood there a moment, and crossed his arms.  Castillo-Ramirez stated to Officer Tate that  Defendant was his traveling companion.  When Defendant resumed his approach to Castillo-Ramirez and Officer Tate, Officer Gowen walked towards Defendant, showed him her police badge and credentials, and asked Defendant if she could speak with him.  Defendant responded in Spanish, a language which Officer Gowen does not speak.  Consequently, Officer Gowen motioned for Defendant to go with her as they approached Officer Tate and Castillo-Ramirez.  Defendant complied with Officer Gowen's hand motion by walking beside Officer Gowen.  Officer Gowen informed Officer Tate that Defendant spoke Spanish and, therefore, requested Officer Tate to speak with Defendant. Officer Gowen then stepped back approximately 10-20 feet from Officer Tate,  Defendant, and Castillo-Ramirez so she could better observe them.  Officer Tate identified herself to Defendant in Spanish and asked Defendant if she could speak with him.  Defendant agreed to speak with Officer Tate.  Officer Tate then asked Defendant if he could speak or understand English.  Defendant replied that he spoke or understood "a little bit" of English. Officer Tate continued her encounter with Defendant in Spanish which the Defendant understood "perfectly."

Like Castillo-Ramirez, Officer Tate asked Defendant about his travel destination. Defendant stated that he and Castillo-Ramirez were going to Denver, Colorado to visit his sick wife.  Defendant also told Officer Tate that he borrowed the vehicle from a friend in Colorado

3

and that he recently traveled from Denver to Phoenix, Arizona.  Castillo-Ramirez continued

pumping gas while Officer Tate and Defendant conversed.

Officer Tate then asked Defendant and Castillo-Ramirez for identification and vehicle

registration.  When Defendant and Castillo-Ramirez presented their identifications and

Defendant presented the vehicle registration to Officer Tate, Officer Tate observed that their

hands were shaking.  In fact, Defendant was fidgeting throughout the encounter.  Next, Officer

Tate made a five minute cell phone call to the El Paso Identification Center (EPIC) to determine

if the EPIC had any information on Defendant or Castillo-Ramirez.[2]  The EPIC did not provide

any information on Defendant or Castillo-Ramirez.  Before proceeding to ask Defendant and

Castillo-Ramirez any further questions, Officer Tate returned the identifications to Defendant

and Castillo-Ramirez, and returned the vehicle registration to Defendant.

Officer Tate next advised Defendant and Castillo-Ramirez that she was looking for drug,

firearm, and contraband violators.  Officer Tate asked Defendant and Castillo-Ramirez if they

had drugs or firearms in the vehicle.  They both replied, "No."  Officer Tate then asked for

permission to search the vehicle and luggage for narcotics, contraband, and weapons.  Both

Defendant and Castillo-Ramirez gave unlimited consent to search the vehicle.  Defendant then

opened the back tail gate of the vehicle and motioned to Officer Tate in the direction of the

vehicle.

Officer Tate searched the luggage first and found nothing incriminating. When Officer

Tate opened the front and rear passenger doors of the vehicle Officer Tate detected a strong odor

of air freshener which is often associated with the concealment of drugs and she noticed that

---

[2]The EPIC determines if subjects are involved in a federal case and whether a vehicle had
crossed the border from Mexico into the United States.

internal panels of the vehicle were not properly secured.  Officer Tate also saw that the rear area appeared to be higher and out of the ordinary, a possible indication of a hidden compartment. Officer Tate asked Defendant and Castillo-Ramirez if she could bring a drug-detecting dog to inspect the vehicle.  Both Defendant and Castillo-Ramirez agreed to the dog inspection. Defendant and Castillo-Ramirez were free to move about while waiting for the K-9 unit to arrive.

Ten minutes later, at about 11:35 a.m., Officer Hermilo Lucero from the State Department of Transportation arrived at the Truck Stop with his drug-detection dog, Brenda. Officer Lucero, who was in uniform and visibly armed, asked the Defendant and Castillo-Ramirez, in Spanish, if Brenda could inspect the vehicle.  Defendant and Castillo-Ramirez agreed to the inspection.  Brenda subsequently alerted to the rear of the vehicle.

Upon further inspection of the vehicle, Officers Lucero and Tate noticed that the bolts anchoring the back seats appeared to have fresh tool marks.  Officers Lucero and Tate removed the seat, pulled up the carpet, and located a false compartment.  The compartment contained three loaded handguns wrapped in industrial-type blue paper towels and covered by white cloth hand towels wrapped in duct tape.  The towels smelled like fabric softener and there was an odor of marijuana.  Defendant and Castillo-Ramirez were arrested after the discovery of the firearms. The entire encounter lasted less than 30 minutes.

After waiving his constitutional rights, Defendant subsequently admitted that the firearms belonged to him and that he planned to take the firearms illegally into Mexico.  Defendant also admitted that he was an illegal alien and had obtained the guns from a friend in Phoenix. Castillo-Ramirez, after waiving his constitutional rights, corroborated Defendant's admissions.

B. DISCUSSION

Defendant claims that Officers Gowen and Tate violated his Fourth Amendment rights under the United States Constitution and the right to travel as established by the Fourteenth Amendment Equal Protection Clause and the dormant Commerce Clause of the United States Constitution.

    1. Fourth Amendment Violations

        a. The Initial Encounter

Defendant argues that his initial encounter with Officers Gowen and Tate was not consensual but rather was an investigative detention. Defendant then argues that the investigative detention was not supported by reasonable suspicion in violation of the Fourth Amendment.

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). An encounter between police and a citizen, however, is not consensual and therefore subject to Fourth Amendment protection "when, considering all the surrounding circumstances, the police conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *United States v. King*, 990 F.2d 1552, 1556 (10th Cir. 1993)(citation omitted). Factors relevant to this totality of the circumstances approach include:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed

6

place; and absence of other members of the public.

*United States v. Hill*, 199 F.3d 1143, 1147-48 (10th Cir. 1999), *cert. denied*, 531 U.S. 830 (2000).

No single factor, however, can be dispositive of whether a detention or seizure occurred.  *Id*. at

1148.

Defendant argues that he did not reasonably believe that he was free to leave when

Officer Gowen approached him, flashed her badge at him, and began speaking English to him.

Defendant also argues that Officer Gowen's motion for him to follow her to Officer Tate

indicated that he could not freely leave.  Defendant further argues that once Officer Tate began

speaking with Defendant, Officer Gowen's observation of that conversation was evidence of a

detention as was Officer Tate's brief use of Defendant's identification in calling the EPIC.

Defendant notes that in Mexico a person is not generally free to ignore or disregard a police

officer.

Defendant seems to be arguing that a modified reasonable person standard considering

his cultural heritage should be applied in determining whether he was detained.[3]  Defendant cites

to *United States v. Patino*, 649 F.2d 724 (9th Cir. 1988) in support of his argument.  In *Patino*,

the Ninth Circuit found that the defendant was detained or seized based on a number of facts

including "a language problem" which required a Spanish-speaking police officer at one point,

the police officers' failure to inform the defendant that she could refuse to answer questions

(although it was "not essential that she have been told and that she understood that she could

refuse"), the police officer's request for an airline ticket and identification immediately upon

_____

[3]Of course, "the particular personal traits or subjective state of mind of the defendant are
irrelevant to the objective 'reasonable person' test set out in *Bostick*, 'other than to the extent that
they may have been known to the officer and influenced his conduct.'  *United States v. Little*, 18
F.3d 1499, 1505 (10th Cir. 1994)(citation omitted).

being stopped, and the fact that the defendant "was an alien who may have felt a greater compulsion to abide by the request of the police." *Id*. at 727. This case is different from *Patino* in several ways. First, Defendant was able to speak with a Spanish speaking police officer almost immediately from the beginning of the stop. Second, the Ninth Circuit subsequently acknowledged that *Patino* was abrogated in that initial questioning of a traveler and asking for identification are not bases for determining that a seizure occurred. *See United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1505 n.2 (9th Cir. 1988). Finally, the District of New Mexico and the Tenth Circuit have addressed the issue of cultural heritage differently than the Ninth Circuit.

The Honorable Senior District Judge John E. Conway in *United States v. Joe*, 770 F.Supp. 607 (D.N.M. 1991) specifically rejected a modified reasonable person standard based on cultural heritage when deciding whether a police interview constituted a custodial interrogation. In coming to that conclusion, Judge Conway distinguished *United States v. Beraun-Panez*, 812 F.2d 578, *modified*, 830 F.2d 127 (9th Cir. 1987) in which the Ninth Circuit ruled that it is appropriate to use a refined or modified reasonable person standard which considers alien status. In that case the Ninth Circuit emphasized that the police officers knew that the defendant was an alien and purposefully exploited that knowledge in interviewing the defendant. Although the Tenth Circuit has not ruled directly on the issue of a refined or modified reasonable person standard based on cultural heritage as it relates to determining whether a seizure has taken place, the Tenth Circuit has rejected attitudes toward authority acquired in foreign countries as carrying any significant weight in deciding whether consent to search is voluntary under the totality of the circumstances. *See United States v. Zapata*, 997 F.2d 751, 759 (10th Cir. 1993). Considering both *Joe* and *Zapata*, the Court concludes that a refined or modified reasonable person standard is not warranted in determining whether there was a detention in this case.

The USA, nonetheless, asserts that a reasonable person under the totality of the circumstances would have felt free to terminate the encounter and therefore no reasonable suspicion was necessary to justify the stop. The USA cites to two factually similar cases in which the Tenth Circuit found that the encounters were consensual. In *United States v. Ringold*, 335 F.3d 1168 (10th Cir.), *cert. denied*, 540 U.S. 1026 (2003), the defendants had already stopped their vehicle in a public place outside of a gas station. *Id*. at 1172. The police officers in that case were in uniform and armed. The police officers neither touched nor brandished weapons during the encounter. The patrol car did not block the defendants' vehicle. The police officers were also polite and spoke in a friendly tone. The Tenth Circuit noted in *Ringold* that merely asking incriminating questions is not relevant to the totality of the circumstances test but what is relevant is the manner in which the questions are asked. *Id*. at1173. In *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996), the defendant was already parked in an open well-lit parking lot. The police officer did not block the defendant's vehicle. The police officer asked the defendant to come over so he would not have to shout at the defendant. The police officer also did not display a weapon, use aggressive language or tone, physically make contact, or obtain any of defendant's personal effects until after seizing the contraband.

Applying *Ringold* and *Sanchez* to the facts of this case, the Court determines that the following facts demonstrate that a reasonable person under the totality of the circumstances would feel free to terminate the encounter: Defendant and Castillo-Ramirez were already stopped; the encounter occurred during the day in a public place; Officers Gowen and Tate were in street clothes; Officers Gowen and Tate's firearms were not visible; Officers Gowen and Tate did not physically touch Defendant and Castillo-Ramirez; Officers Gowen and Tate did not block Defendant's vehicle; Officers Gowen and Tate did not use aggressive language but instead

spoke in a normal tone of voice; and Officer Tate returned the identification documents and vehicle registration before requesting permission to search the vehicle.  Additionally, Officer Gowen's hand motion for Defendant to come with her to where Officer Tate and Castillo-Ramirez were standing is not indicative of a detention because Defendant was going to walk in that direction regardless of whether Officer Gowen motioned to him.  In fact, Officer Gowen did not command Defendant to go with her and Defendant walked side-by-side with Office Gowen rather than following her in a submissive manner.  Also, there is no evidence that Officer Gowen blocked or cornered Defendant in any way once Officer Tate began conversing with Defendant. Accordingly, Defendant's initial encounter with Officers Gowen and Tate was consensual and the Fourth Amendment was, therefore, inapplicable and not subject to violation.

      b.  Initial Consent to Search

The Defendant then argues that if the initial encounter was an investigative detention unsupported by reasonable suspicion in violation of the Fourth Amendment, the illegal detention tainted Defendant's subsequent consent to search.  Defendant maintains that the taint had not been purged.  Defendant further argues that even if there was no Fourth Amendment violation as to the initial encounter, his consent to search the vehicle was not voluntary.

      (1) Tainted Consent

As determined above, the Fourth Amendment did not apply to Defendant's initial encounter with Officers Gowen and Tate.  Consequently, Defendant's tainted consent theory is without merit.  However, assuming for the sake of argument that the initial encounter violated the Fourth Amendment in that Defendant was unlawfully detained, the Court will proceed to analyze Defendant's tainted consent argument.

The Tenth Circuit summarized the law on tainted consent as follows:

> A search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances.  The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal stop.  The government must establish that [defendant's] consent to search is "sufficiently an act of free will to purge the primary taint of the illegal [seizure], [or] it must be suppressed as fruit of the poisonous tree."  When examining the totality of the circumstances, no single fact is dispositive but three factors are especially significant: "the temporal proximity of the illegal stop and the consent, any intervening circumstances, and the purpose and flagrancy of [the official] misconduct."

*United States v. Fernandez*, 18 F.3d 874, 881-82 (10th Cir. 1994)(citations and footnote omitted).

In determining whether consent was voluntary, the court engages in a two step test.  First, the government "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998), *cert. denied*, 525 U.S. 903 (1998)(quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).  "Second, the government must show that the police did not coerce the defendant into granting his consent." *Id*. (citing. *Angulo-Fernandez*, 53 F.3d at 1180). It should be noted that "[a]lthough informing a defendant of his right to refuse consent is not a prerequisite to establishing voluntary consent, [the Tenth Circuit] consider[s] it a factor 'particularly worth noting.'" *Fernandez*, 18 F.3d at 882 (citations omitted).

The Defendant argues that his initial consent to search occurred while he was illegally detained thereby establishing no attenuation between the illegal detention and the consent. Similarly, the Defendant argues that there were no intervening circumstances to break the causal connection between the illegal detention and the consent.  For these reasons, Defendant concludes that the taint of the consent was not purged.

The USA argues, on the other hand, that the totality of the circumstances nevertheless demonstrates voluntary consent.  The USA notes that Officer Tate spoke to the Defendant and

11

Castillo-Ramirez in a normal tone of voice; Officer Tate spoke Spanish to Defendant which

Defendant understood; Defendant's consent was unequivocal and without limitations; neither

Officer Tate nor Officer Gowen physically mistreated Defendant or Castillo-Ramirez; and

Officers Tate and Gowen did not use any violence, threats, threats of violence, promises,

inducement, deception or trickery to obtain Defendant's consent.[4]  The Court concludes that the

USA carried its heavy burden of showing that Defendant's initial consent to search was in fact

voluntary under the totality of the circumstances and therefore sufficient to purge any taint from

an unlawful detention.  Hence, Defendant's tainted consent theory fails for that reason as well.

(2) Voluntary Consent Absent Tainted Consent

Defendant contends in the alternative that his initial consent was not freely and

intelligently given.  Specifically, Defendant argues that due to Officer Tate's limited Spanish

abilities, Defendant did not understand that the request to search the vehicle was actually a

question or that he could refuse to consent.  Moreover, Defendant contends that because of the

language barrier, he could not ask Officer Tate if the request for permission to search the vehicle

was mandatory or not.  Finally, Defendant contends that in using the Spanish word "revisar" in

asking for permission to search the vehicle, Officer Tate did not correctly express her desire to

thoroughly search the vehicle but instead requested Defendant to give permission to merely

"review" the vehicle or to superficially inspect the vehicle.  This contention is supposedly

supported by an affidavit by University of New Mexico Spanish professor Enrique Lamadrid.

The Defendant, however, has failed to file the affidavit with the Court.  Mr. Fine also faxed to

---

[4]Interestingly, the USA observes that Defendant admitted to consent by arguing in his
Motion to Suppress that "illegal detention tainted Mr. Lopez-Molina's consent to search...."
Motion to Suppress at 4.

Chambers a letter dated May 16, 2008 containing mostly unpublished legal citations which indicate that: 1) "registrar" means search; 2) "revisar"does not mean search; and "revisar" does mean search.[5]

"In determining whether an individual has sufficient comprehension of English to provide voluntary consent, courts examine his ability to interact intelligently with the police." *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999)(citing among other cases *United States v. Sanchez-Valderuten,* 11 F.3d 985, 991 (10th Cir. 1993)(holding that defendant had necessary understanding of English where he produced driver's license and registration immediately upon request and appropriately responded to police officers' questions regarding his travel plans.)).  The question is whether based on the totality of the circumstances, would a reasonable agent have understood the defendant's acts as consent to search.  *United States v. Flores*, 48 F.3d 467, 469 (10th Cir.), *cert. denied*, 516 U.S. 839 (1995).

In this case, it is clear that Defendant understood Officer Tate "perfectly" and responded appropriately to Officer Tate's requests.  Tr. 72.  For example, when Defendant gave Officer Tate permission to search the vehicle Defendant opened the back of the vehicle and did not object to the manner of Officer Tate's search.  Furthermore, the USA submitted an affidavit by Brian Knoll, a Spanish speaking Border Patrol agent for 23 years, who stated that the word "revisar" is used and understood to mean "search."  Agent Knoll also contacted the Mexican Consulate where he spoke with Sergio Morales-Tellez who confirmed that in asking to search a car the word "revisar" is used.  Moreover, the legal citations provided by Defendant in the May 16, 2008 faxed letter simply show that there is more than one way to say "search" in Spanish.

_____

[5]Defendant does not justify why he did not include these legal citations in his supplemental brief so that the USA could respond to them.

13

Considering the absence of the Lamadrid affidavit on the one hand and the convincing nature of Agent Knoll's affidavit on the other hand, the Court determines that Defendant understood "revisar" to mean a search, not just a superficial review.[6]  In sum, there was no language barrier affecting Defendant's otherwise voluntary initial consent.

        c.  Waiting for the K-9 Unit

Defendant further asserts that even if the initial encounter was consensual, that consensual encounter was transformed into an investigative detention requiring reasonable suspicion when Defendant was instructed to wait for the K-9 unit to arrive.  Defendant cites to *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997) wherein the Tenth Circuit states that "[a]n investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification."[7]

The USA contends that the decision to call the K-9 unit was within the scope of Defendant's initial consent to search the vehicle and that the ten minute wait for the K-9 unit, therefore, did not violate the Fourth Amendment.  "The scope of a search is 'generally defined by its expressed object and is limited by the breadth of the consent given.'" *United States v. Ramstad*, 308 F.3d 1139, 1146 (10th Cir. 2002)(quoting *United States v. Elliott*, 107 F.3d 810,

---

[6]The Court notes that "revisar" is defined in *Simon & Schuster's International Dictionary, English/Spanish, Spanish/English* as meaning to examine and to inspect as well as to revise or to check.  This definition of "revisar" along with Defendant's act of opening the back of the vehicle further confirm that Defendant understood "revisar" to mean "search."

[7]Defendant had initially alleged a 30 minute wait for the K-9 unit which Defendant considered a long enough wait to be considered an arrest requiring a showing of probable cause. The testimony at the evidentiary hearing, however, demonstrated that the wait was only for about ten minutes and that Defendant was free to move about during that time. Clearly, the wait for the K-9 unit was not an arrest.

14

814-15 (10th Cir. 1997)).   "The standard for measuring the scope of an individual's consent to search is that of 'objective reasonableness,' asking what the typical reasonable person would have understood to be the scope of his or her consent under the circumstances."  *Pena*, 143 F.3d at 1367-68 (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  Scope of a search is likewise determined from the totality of the circumstances.  *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996).  If the expressed purpose of the search to which the defendant consented was to look for drugs or guns, that implies that the police officer could look wherever drugs or guns might be hidden.  *Id*. at 1147.  Moreover, "[w]here a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle."  *United States v. Bustillos-Munoz*, 235 F.3d 505, 515 n.5 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

The record indicates that Defendant's consent to search the vehicle was consent to a full and thorough search of the vehicle for drugs or guns which included a drug-detecting dog inspection.  This conclusion is supported by the fact that neither Defendant nor Castillo-Ramirez limited the breadth of the consent to search, and by the fact that Defendant and Castillo-Ramirez did not object to a drug-detecting dog inspection which they voluntarily consented to on two separate occasions.[8]  Defendant and Castillo-Ramirez also did not object to the duration of the search which extended to the time expended on waiting for the K-9 unit to arrive.  *See Ramstad*, 308 F.3d at 1147 ("The defendant never objected to the duration of the search and never demanded to be present in the vehicle during the search.  Thus, his consent was reasonably interpreted by the officer to proceed as he did."); *United States v. Santurio*, 29 F.3d 550, 553

---

[8]Defendant does not challenge the voluntariness of his consent to have Brenda inspect the vehicle.

(10th Cir. 1994)(finding search did not exceed scope of consent to search van even though it took 30 minutes for drug detection dog to arrive and stating that "this court has specifically ruled that a failure to object to the continuation of a search indicates that the search was conducted within the scope of the consent given.").  Under all of these circumstances, a "typical reasonable person" would have understood that the scope of his consent to search the vehicle included waiting for a drug-detecting dog to inspect the vehicle.

The USA further contends that if Defendant and Castillo-Ramirez were detained for investigative purposes while awaiting the K-9 unit, Officer Tate had reasonable suspicion to detain them at that point.  The Court agrees.  Reasonable suspicion is easily determined from the following evidence: the discrepancy in the travel destination and ownership of the vehicle,[9] the nervous behavior of both Defendant and Castillo-Ramirez when presenting identifications,[10] the overbearing smell of air freshener which can be used to mask the odor of drugs, the fact that the internal panels in the vehicle were not secured, and the appearance of the rear of the vehicle which was high and out of place.  Furthermore, Defendant's voluntary consent to Officer Lucero's subsequent request to have Brenda inspect the vehicle would have purged any Fourth Amendment violation occurring during the wait for the K-9 unit.  In sum, the ten minute wait for the K-9 unit did not violate the Fourth Amendment.

---

[9]Unfortunately for Defendant, *Wood* also provided that "inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity."  *Wood*, 106 F.3d at 947.

[10]Of course, nervousness by itself is not particularly helpful in establishing reasonable suspicion.  *Wood*, 106 F.3d at 948.

2.  Right to Travel

a.  The Fourteenth Amendment Equal Protection Clause

Defendant contends that because Officers Gowen and Tate were singling out drivers and passengers of out-of-state license plates to investigate, Officers Gowen and Tate impermissibly infringed on Defendant's right to freely move throughout the states in contravention of the Fourteenth Amendment Equal Protection Clause.  The United States Supreme Court has held that the "right to travel analysis refers to little more than a particular application of equal protection analysis." *Zobel v. Williams*, 457 U.S. 55, 61 n.6 (1982).  In *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997), a case cited by Defendant, the Sixth Circuit stated that "[t]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures.  This protection becomes relevant even before a seizure occurs."  The Sixth Circuit also stated that "[c]itizens are cloaked at all times with the right to have the laws applied to them in an equal fashion...."  *Id*. at 353.  The *Avery* case, however, is distinguishable from this case because it examined an equal protection claim premised on unfair surveillance of persons based on race.  In this case, the allegedly unfair conduct targets people driving vehicles with out-of-state license plates, not people belonging to a protected class like in *Avery*.

Although the Tenth Circuit has not directly addressed the equal protection right to travel issue presented by Defendant, the Tenth Circuit addressed the equal protection right to travel issue as it relates to routine license and registration checks on out-of-state vehicles.  In rejecting the equal protection claim in that situation, the Tenth Circuit stated:

> While the right to travel freely interstate is a "basic right" embodied in the Constitution, *United States v. Guest*, 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966), we do not believe that this right was abridged in this instance. The right to interstate

travel protects individuals from "statutes, rules, or regulations which <u>unreasonably burden or restrict this movement</u>." *Shapiro v. Thompson*, 394 U.S. 618, 629, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969). Moreover, because they are in plain view, no privacy interest exists in license plates. *United States v. Matthews*, 615 F.2d 1279, 1285 (10th Cir.1980). Debree's registration check on Walraven's Cadillac neither unreasonably burdened nor restricted Walraven's travel. Unless a registration check reveals information which raises a reasonable suspicion of criminal activity, the subject remains unaware of the check and unencumbered. As the district court aptly noted: "In view of the manner in which the license checks are conducted, the extent of any intrusion upon the traveling public ... hardly rises to an impermissible interference with the fundamental right to travel from state to state." *Pitchford*, 699 F.Supp. at 264.

*United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989)(emphasis added).

Other persuasive arguments in opposition to Defendant's equal protection claim include, first, the fact that the Defendant has not established that an illegal alien is protected by the Equal Protection Clause. Second, as alluded to above, the Defendant has failed to establish that people in vehicles with out-of-state license plates are a class protected by the Equal Protection Clause. Third, it is possible for New Mexico residents (as opposed to out-state residents) to be driving vehicles with out-of-state license plates and thereby be subject to the Task Force's observations and interviews. In that case, interstate travel is not involved. Fourth, the Defendant has failed to establish that a violation of the Equal Protection Clause would result in the application of the exclusionary rule. Fifth, the Defendant has not shown how his right to equal protection was impinged when the encounter was consensual and he could have driven away. Sixth, the Defendant has not cited to any authority which prohibits police officers from targeting out-of-state license plates when the vehicles are already stopped. Finally, there is a rational basis for the type of targeting the Task Force is engaged in, namely that Interstate 40 is a known corridor for the transportation of drugs and contraband across the country. For all of the foregoing reasons, Defendant fails to convince the Court that randomly observing and sometimes interviewing people in vehicles with out-of-state license plates unreasonably burdens or restricts

interstate travel.  Accordingly, Defendant's equal protection claim has no merit.

      b.  The Dormant Commerce Clause

      Defendant also argues that his right to travel freely was violated under the dormant

Commerce Clause.  Although the Commerce Clause explicitly gives Congress power to regulate

interstate commerce, the Commerce Clause also impliedly restricts the states' power to burden

interstate commerce.  This implied restriction is called the "dormant Commerce Clause."  The

Tenth Circuit has summarized the dormant Commerce Clause law as follows:

> "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (citation omitted). The person challenging a statute that regulates evenhandedly bears the burden of showing that the incidental burden on interstate commerce is excessive compared to the local interest. *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).
>
> By contrast, if a statute discriminates against interstate commerce either on its face or in its practical effect, it is subject to the strictest scrutiny, and the burden shifts to the governmental body to prove both the legitimacy of the purported local interest and the lack of alternative means to further the local interest with less impact on interstate commerce. *Wyoming v. Oklahoma*, 502 U.S. 437, ----, 112 S.Ct. 789, 799-801, 117 L.Ed.2d 1 (1992). "Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).

*Dorrance v. McCarthy*, 957 F.2d 761, 763 (10th Cir. 1992).  "The crucial inquiry, therefore, must

be directed to determining whether [the challenged laws are] basically a protectionist measure,

or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects

upon interstate commerce that are only incidental."  *City of Philadelphia v. New Jersey*, 437 U.S.

617, 624 (1978).

Defendant argues essentially that out-of-state consumers at New Mexico gas stations are overburdened by the Task Force because of the delay and stress of their encounters with Task Force officers.  Defendant does not analyze his argument under either *Dorrance* or *City of Philadelphia*.  Moreover, the Defendant fails to cite to any authority that would provide exclusion of evidence as a remedy for violating the dormant Commerce Clause.  In addition, Defendant was not involved in interstate commerce unless one considers illegal trafficking in firearms interstate commerce.  The USA also correctly observes that the dormant Commerce Clause is not violated when New Mexico police officers stop out-of-state travelers for traffic violations on a daily basis, so why would the dormant Commerce Clause be violated by random observing and questioning of people already stopped who have vehicles with out-of-state license plates.  Finally, Defendant does not explain how the Task Force's actions overburdens interstate commerce.  Defendant's dormant Commerce Clause argument is likewise unpersuasive and therefore lacks merit.

C.  CONCLUSION

Officers Tate and Gowen did not violate Defendant's Fourth Amendment rights nor did they violate Defendant's right to travel under the Fourteenth Amendment's Equal Protection Clause or the dormant Commerce Clause.

IT IS ORDERED that:

1.  the USA's request to strike Defendant's supplemental brief is denied;

2.  Defendant's Motion for Leave to File Supplemental Memorandum in Support of Suppression Out of Time (Doc. No. 45) is granted; and

3.  Defendant's Motion to Suppress (Doc. No. 30) is denied.


_____

SENIOR UNITED STATES DISTRICT JUDGE